# IN THE COURT OF APPEALS OF IOWA

_____

No. 25-0573
Filed May 27, 2026

_____

**State of Iowa,**
Plaintiff–Appellee,

v.

**Roger Rueben Gillespie,**
Defendant–Appellant.

_____

Appeal from the Iowa District Court for Appanoose County,
The Honorable Michael Carpenter, Judge.

_____

**AFFIRMED**

_____

Nick Sarcone of Babich Sarcone, P.L.L.C., Des Moines,
attorney for appellant.

Brenna Bird, Attorney General, and Adam Kenworthy, Assistant Attorney
General, attorneys for appellee.

_____

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Schumacher, J.

1

**SCHUMACHER, Judge.**

Following the death of a two-year-old child, a jury in the criminal trial of Roger Gillespie heard from over twenty witnesses, including a forensic pathologist who opined that the child's cause of death was blunt force injuries to the head, with the manner of death being homicide. Gillespie appeals his convictions for child endangerment causing death in violation of Iowa Code sections 726.6(1)(a), 726.6(4), 726.6(5) (2024), and murder in the first degree in violation of sections 707.1 (2024), 707.2(1)(e), and 726.6(1)(b). He was sentenced to life in prison without the possibility of parole on the murder conviction.[1] Gillespie asserts that the evidence was not sufficient to support the convictions and the district court abused its discretion in denying his motion for mistrial. Upon our review, we affirm.

## I.    Background Facts & Proceedings

Gillespie and Kaytee Gregson both lived in Centerville. They became acquainted because they both had sons who were friends. Gregson also had a two-year-old daughter, J.M. Although Gregson considered Gillespie a friend, he would sometimes proposition her sexually. Gregson indicated she ignored these propositions.

Gillespie offered to babysit J.M. for free because of Gregson's difficulty affording childcare. He began babysitting J.M. at his house, sometimes keeping her overnight. Gillespie also offered to assist in potty training J.M. Gregson left a pink potty chair at the house for this purpose.

In the early afternoon of January 19, 2024, Gillespie called 911 requesting an ambulance. He informed the dispatcher that J.M. slipped and

---

[1] The district court did not enter judgment on the child-endangerment-resulting-in-death conviction, citing *State v. Wissing*, 528 N.W. 561 (Iowa 1995).

fell in the bathroom and would not wake up. He stated that he placed her in the bathtub with warm water to wake her up, which was unsuccessful.

Emergency services arrived at the residence and found J.M. unresponsive in the bathtub. They noticed J.M. was "posturing" on her right side, meaning her muscles were repeatedly contracting. They also observed J.M. had a small laceration on the back of her head without any bleeding and minor bruising on her face. Gillespie called Gregson, who arrived at his house and rode in the ambulance with J.M., who was transported to the emergency room.

Law enforcement also responded to the 911 call. After J.M. was transported from the scene, they talked to Gillespie about what happened. Gillespie stated he left J.M. in the bathroom alone, went into another room and heard a "thud" from the bathroom. He said he went back into the bathroom, found J.M. on the floor unresponsive and placed her in the bathtub to wake her up. When she did not wake, he called 911.

Medical staff at the hospital determined that J.M. had serious trauma to her head. Her brain was bleeding internally, and they could not treat her long term. J.M. was flown to the University of Iowa Hospitals & Clinics for additional treatment.

Later, while J.M. was in the hospital, Gillespie used Facebook Messenger to communicate with Gregson. He told Gregson that he assumed J.M. had climbed on the sink in the bathroom to grab bath toys on the vanity when she fell. Gillespie sent numerous messages to Gregson, conveyed he was upset with her, and assigned blame to Gregson for what happened. He also sent several messages to friends and family discussing the incident. But, the next day, he sent Gregson additional messages altering his version of what

happened. He stated he had gone down to the basement to change laundry, leaving J.M. alone in the bathroom, and that was when she fell.

Local law enforcement requested assistance from the Iowa Division of Criminal Investigation. Multiple search warrants were executed at Gillespie's home. Law enforcement took pictures of the interior and seized cell phones and electronic devices. They noted that Gillespie had several exterior and interior cameras on the property. There was not a camera in the bathroom.

There was a motion-activated camera in the mudroom, where the door to the basement was located, and a camera in the living room. Law enforcement determined after review of the saved footage that between 3:00 and 4:00 p.m. on January 19, Gillespie accessed the camera system from his phone. Although there was footage from the mudroom on the 18th, there was no footage for the 19th. The living room camera also had no footage for the 19th.

A few days after the incident, Gillespie posted a video on Facebook where he threw J.M.'s potty chair outside. He was audibly upset in the video and stated, "you did this, [Gregson]" while throwing the chair.

On January 27, J.M. died from her injuries and Gillespie was arrested. A law enforcement agent conducted an interview with Gillespie, where he initially stated that he left J.M. in the bathroom, went to change laundry in the basement, and heard a noise which he thought was a shampoo bottle falling upstairs. But, as the interview progressed, he changed his story, asserting that J.M. had fallen down the basement stairs while he was showering. At a later interview while in custody, Gillespie stated he changed

his story to save J.M.'s brother from guilt, as J.M. was probably looking for her brother in the basement when she fell.

At trial, several doctors and a pediatric nurse practitioner testified to the extent of J.M.'s injuries. Erin Brown, a nurse practitioner, stated that her team determined that the injuries were inconsistent with a single-impact fall but that the injuries were more consistent with a multi-story fall or a major car accident. Because of observable retinal hemorrhages in J.M.'s eyes, a fracture to the occipital bone on the back of her head, and bleeding in the brain, the doctors determined the injuries required rapid acceleration and deceleration with significant force.

The pathologist who performed the autopsy on J.M., Dr. Dennis Firchau, testified that J.M.'s injuries were caused by her brain moving around and back and forth combined with blunt force trauma to the back of the head from striking a blunt surface. He stated J.M.'s injuries were inconsistent with a fall down a flight of stairs or off a low-height surface but were consistent with multiple impacts to the back of the head. Dr. Firchau found the cause of death to be homicide.

Gillespie also testified at trial. And he again changed his story. This time, he stated he was carrying J.M. down the basement stairs, tripped on the blanket she was carrying, and fell on top of her. He attempted to wake her up in the bathtub for around thirty minutes, called his daughter and parents, then called 911. He said he did not tell the truth initially because he was embarrassed that he fell on top of J.M.

Another pathologist, Dr. Bradley Randall, testified for the defense after Gillespie's testimony. He had previously prepared a report concluding that J.M. had fallen alone backwards down the basement stairs. But he was

informed of Gillespie's new explanation a day before Gillespie testified. Dr. Randall stated Gillespie's explanation could have caused J.M.'s injuries, but also stated that it was possible that Gillespie could have shaken J.M.

During trial, a video was played of Gillespie's second interview with law enforcement. The defense moved for a mistrial during a break the next day because the video contained audio of Gillespie requesting an attorney, violating a motion in limine. The district court determined the statement was audibly subtle and did not "think it rises to the level of a mistrial issue," and denied the motion.

The jury found Gillespie guilty on both counts. Gillespie appeals.

## II.    Sufficiency of the Evidence

Gillespie asserts the district court erred in denying his motion for judgment of acquittal but appears to be arguing a sufficiency challenge in his brief, citing *State v. Crawford*, 972 N.W.2d 189 (Iowa 2022). Sufficiency of the evidence is reviewed "for correction of errors at law." *Id.* at 202. "[W]e are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.*

> Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt. In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all "legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence."

*Id.* (citation omitted). To prove Gillespie's guilt of child endangerment causing death, the State had to show:

1. On or about January 19, 2024, the defendant was a person having custody or control of [ J.M.]

6

2. [J.M.] was then under the age of 14.

3. The defendant acted with knowledge that he was creating a substantial risk to [J.M.]'s physical health or safety.

4. The defendant's act resulted in the death of [J.M.]

To prove Gillespie was guilty of murder in the first degree, the State had to show:

1. On or about January 19, 2024, the defendant was a person having custody or control of [J.M.]

2. [J.M.] was then under the age of 14,

3. The defendant intentionally used unreasonable force or cruelty against [J.M.].

4. The defendant's act resulted in the death of [J.M.]

5. The defendant acted with malice aforethought.

6. [J.M.]'s death occurred under circumstances showing an extreme indifference to human life.

Gillespie argues that the State failed to prove he "acted with malice aforethought," that he "knowingly acted in a manner that created a substantial risk to J.M.'s physical, mental, or emotional health or safety," or that he "had intentionally or knowingly harmed J.M." He bases his argument on the fact that the treating medical professionals centered their testimony around the first two versions of events Gillespie provided to law enforcement, the doctors' testimony was equivocal concerning the true cause of the injuries rendering the evidence speculative, and because there were no witnesses to the incident.

We first determine whether there was substantial evidence that Gillespie acted with malice aforethought. The State argues that because

7

Gillespie employed intentional, unreasonable force against J.M., he consequently acted with malice aforethought. We agree.

Testimony from the treating medical professionals provided substantial circumstantial evidence from which the jury could determine Gillespie intentionally used unreasonable force against J.M. *See Godfrey v. State*, 962 N.W.2d 84, 102 (Iowa 2021) (reiterating "circumstantial and direct evidence are equally probative" and "circumstantial evidence is sufficient" when it "allow[s] a factfinder to draw a legitimate inference from the evidence presented" (cleaned up)).

Brown, the nurse practitioner, testified J.M.'s injuries, which included extensive brain and eye bleeding, showed "an acceleration/deceleration force and generally with some sort of rotational as well." Her testimony indicated that J.M.'s injuries were consistent with a major vehicle collision or a multi-story fall. Brown noted, "We're talking generally more like a motor vehicle accident where there is, again, a big, forceful kind of multiple movements, different directions, so you can see acceleration/deceleration shearing-type forces in accidental instances in addition to applied forces." When questioned on what could cause these injuries absent a car wreck or an extensive-height fall, Brown stated, "the findings that we see in [J.M.] are overwhelmingly most consistent with an abusive head trauma picture." Brown explained that "abusive head trauma" is equivalent to the outdated term "shaken baby." Brown also described the bruising found on the child, calling it concerning and not generally consistent with normal childhood play.

Dr. Satsuki Matsumoto, a child neurologist, testified there was concentrated damage to the right side of J.M.'s brain, which was "[i]ndicative of significant force that happened to the head." Because of the force required to inflict this injury, Dr. Matsumoto stated that a "[t]wo-year

old cannot do this on her own." Dr. Matsumoto and his team determined that the injury was so severe that there was nothing that could be done to save J.M.'s life.

Dr. Firchau, the pathologist who performed the autopsy, testified that both of J.M.'s eyes had "bilateral retinal hemorrhaging" and "nerve sheath" damage. He also stated, in his professional opinion, that there were "multiple sites of impact that are kind of overlapping and close to each other" on the back of the head, indicating impact on an irregular blunt surface. When asked to explain how the injuries to the eyes and brain could occur, Dr. Firchau responded:

> It would require the types of motion that would allow the—or cause the brain to essentially move back and forth, side to side, and kind of twist around itself inside the head. Now, pairing that with the contusion on the back of the head and the distribution of contusions, multiple overlying or multiple impacts, would actually correspond to that or would actually be very consistent with that, the forces to generate those types of injuries in the head.

Based on the injuries to the eyes, back of the head, and brain, Dr. Firchau testified that his opinion on the cause of death was homicide. This "[e]xtensive testimony from well-qualified physicians who either treated [J.M.] or examined [her] body . . . indicated [J.M.] died from inflicted trauma." *See State v. Olea*, No. 14-0218, 2015 WL 2406757, at *4 (Iowa Ct. App. May 20, 2015).

While none of the State's witnesses definitively stated what event caused the child's death, Gillespie's expert witness, Dr. Randall, also left open several possibilities. Having learned about Gillespie's new version of events the day before he testified, Dr. Randall was asked if he had been "the

individual classifying the manner of death on this case, what would [his] classification be?"

> A. It depends. If I was in Dr. Firchau's shoes, I probably would have called it homicide, but with the understanding that that is not to a particular high level of certainty, there is no—I mean, the Institute of Health Statistics merely says that a manner can be ascribed more likely than not. So if you feel that you're fifty-one percent sure, you can say that, and if you feel that you're sixty percent sure, that still means there is a forty percent chance that you're wrong.

> Q. And in this case, Dr. Firchau did not have the information regarding the testimony of Roger about falling down the stairs with [J.M.] in front of him? A. That's correct, and had he had that, I don't know if he would have the same answer or not.

> Q. Would you—with that information now, what would your answer be? A. My answer would be undetermined.

But all medical providers agreed that the injuries and death were caused by significant trauma and not a single-impact fall. Here, the jury could consider not only the medical testimony, but the actions of Gillespie, his changing versions and the other unexplained bruising. *See State v. Ernst*, 954 N.W.2d 50, 56–57 (Iowa 2021) (finding inferences from circumstantial evidence including defendant's car in the area on video footage, along with false story of defendant supported substantial evidence of attempted burglary conviction).

Because the jury determined Gillespie inflicted intentional, unreasonable force to [J.M.], they could also infer he acted with malice aforethought. The jury was instructed that malice "may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act."

The evidence supports a determination by the factfinder that Gillespie shook J.M. and struck her head against a blunt surface, showing an "extreme indifference to human life." Based on the injuries to J.M. and the evidence supporting causation, the jury "could infer he killed [J.M.] willfully with malice aforethought." *See State v. Linderman*, 958 N.W.2d 211, 222 (Iowa Ct. App. 2021); *see also State v. Rhode*, 503 N.W.2d 27, 39 (Iowa Ct. App. 1993) (determining the court could infer malice aforethought when the record showed that the defendant "slammed [the victim]'s head against a hard, flat surface causing a severe head injury"). The jury could also infer that Gillespie knowingly created a substantial risk to J.M.'s health based on the same evidence.

Although Gillespie claims the State failed to prove beyond a reasonable doubt that he "knowingly acted in a manner that created a substantial risk to J.M.'s physical, mental, or emotional health or safety or acted with malice aforethought" as he asserts the experts were not definitive on the cause of the injuries, it is within the province of the jury to determine what weight expert testimony should receive. *See State v. Lindsey*, 302 N.W.2d 98, 103 (Iowa 1981). And the jury could decide not the credit Gillespie's last version of events. *Linderman*, 958 N.W.2d at 220–21. Accordingly, we find substantial evidence supports Gillespie's convictions.

### III. Motion for Mistrial

Gillespie next contends the district court abused its discretion by denying his motion for mistrial based on an alleged violation of a motion in limine. The State argues this issue is not preserved for our review because Gillespie had a prior opportunity to review the video and failed to "move for mistrial at the earliest opportunity."

We review a denial of a motion for mistrial for an abuse of discretion. *State v. Brown*, 5 N.W.3d 611, 614–15 (Iowa 2024). When reviewing, "we give district courts 'considerable discretion in ruling upon motions for mistrial, since they are present throughout the trial and are in a better position than the reviewing court to gauge the effect of the matter in question on the jury.'" *Id.* at 615 (citation omitted). "[W]e ordinarily only find an abuse of discretion upon the denial of a mistrial 'where there is no support in the record for the trial court's determination.'" *Id.* (citation omitted).

During trial, the State offered a video exhibit showing an interview between law enforcement and Gillespie in which he asked for an attorney. Gillespie asserts the jury heard this statement, and thus the State violated a motion in limine, which states that "the Jury not be told at any time by any party or witness in any form at any stage of the trial that the defendant . . . requested an attorney." The court denied the motion, reasoning the request for the attorney was barely audible and it did not rise to the level of a mistrial.

The State asserts error is not preserved on this issue. We agree. Before the State was allowed to admit the video exhibit, Gillespie's counsel objected, asserting they were unaware of what portions of the video would be played. The court and parties agreed the State would provide timestamps from the video to alert the defense of what would be played. Gillespie's counsel was to review those portions as it was agreed the video would be played the next day.

The next day, the State recalled the law enforcement officer to testify and offered the video exhibit. When the court asked defense counsel if they had an objection, they responded negatively and informed the court that the parties "added some additional clips for context." The State then played the video for the jury, which showed Gillespie asking for an attorney without an immediate or contemporaneous objection or motion from counsel. Defense

counsel cross-examined the officer, the State put on another witness, and defense counsel moved for mistrial during the next break.

Gillespie failed to timely move for mistrial so the court could address and remedy the issue. *See State v. Cole*, No. 24-0589, 2025 WL 2408110, at *2–3 (Iowa Ct. App. Aug. 20, 2025) (citing *State v. Diaz*, No. 24-0496, 2025 WL 1704324, at *4 (Iowa Ct. App. June 18, 2025) (finding error was not preserved on motion for mistrial where defense counsel waited until a break during trial to object, after another witness had testified)). Because "'[a] motion for mistrial must be made when the grounds therefore first become apparent[,]' . . . . [w]e find the delay between the challenged testimony and the motion for mistrial in this instance was too long to preserve error." *Diaz*, 2025 WL 1704324, at *4 (quoting *State v. Jirak*, 491 N.W.2d 794, 796–97 (Iowa Ct. App. 1992)).

## IV. Conclusion

We affirm Gillespie's convictions and find his alleged error based on his motion for mistrial unpreserved for our review.

**AFFIRMED.**